1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KEVIN KNIGHT, Individually and On
Behalf of All Others Similarly Situated,

                          Plaintiff,

              v.

CYTOMX THERAPEUTICS, INC., SEAN
A. MCCARTHY, CARLOS CAMPOY, and
DEBANJAN RAY,

                          Defendants.

Case No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Kevin Knight ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CytomX Therapeutics, Inc. ("CytomX" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired CytomX securities between May 17, 2018, and May 13, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      CytomX was founded in 2008 and is headquartered in South San Francisco, California.  CytomX operates as an oncology-focused biopharmaceutical company in the U.S.  The Company develops a novel class of investigational antibody therapeutics based on its Probody technology platform for the treatment of cancer.  CytomX's lead product candidates in the clinical stage include, among others, CX-072 and CX-2009.

1

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.      CytomX has been evaluating CX-072 in its "PROCLAIM" series clinical program for several years.  For example, the PROCLAIM-CX-072-001 clinical trial was designed to assess the tolerability and preliminary antitumor activity of multiple doses of CX-072 as a monotherapy or as a combination therapy with ipilimumab (which Bristol-Myers Squibb Company markets under the brand name Yervoy) or vemurafenib (which Roche markets under the brand name Zelboraf) in patients with advanced, unresectable solid tumors or lymphoma.  The Company also began conducting a Phase 2 clinical trial called PROCLAIM-CX-072-002, which was initiated in October 2019, and is an open-label, multi-center clinical trial evaluating CX-072 in combination with ipilimumab in patients with unresectable or metastatic melanoma.

4.      Likewise, CystomX had been evaluating CX-2009 under its own "PROCLAIM" brand clinical program.  This program includes the PROCLAIM-CX-2009-001 clinical trial, which is a Phase 1/2 trial evaluating the tolerability and preliminary antitumor activity of CX-2009 as a monotherapy, which CytomX initiated in June 2017.  This clinical program also proceeded in multiple parts—Parts A and A2, which are monotherapy dose escalation studies; and Part B, which is a Phase 2 expansion study of CX-2009 monotherapy at 7 mg/kg administered every three weeks in up to 40 patients with hormone receptor (ER, PR) positive, HER2 negative breast cancer, which Defendants announced in December 2019 based on the tolerability and activity data from Part A and A2 of the study.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CytomX had downplayed issues with CX-072's efficacy observed in the PROCLAIM-CX-072 clinical program; (ii) CytomX had similarly downplayed issues with CX-2009's efficacy and safety

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

observed in the PROCLAIM-CX-2009 clinical program; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On May 13, 2020, during after-market hours, CytomX made available abstracts for the Company's clinical presentations for CX-072 and CX-2009.  Results from the PROCLAIM-CX-072 clinical program showed a response rate of 8.8%, compared to a response rate of 18.5% in patients receiving the combination of CX-072 and ipilimumab.  Meanwhile, results from the PROCLAIM-CX-2009 clinical program showed "evidence" of clinical activity at doses at least 4 mg/kg 3x/week, but also suggested a significantly higher rate of serious or greater treatment-related toxicity to the eyes at dose equivalents at least 8 mg/kg 3x/week.

7.      Following the release of the foregoing data, CytomX's stock price fell $5.21 per share, or 36.08%, to close at $9.23 per share on May 14, 2020.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  CytomX is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.    Plaintiff, as set forth in the attached Certification, acquired CytomX securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.    Defendant CytomX is a Delaware corporation with principal executive offices located at 151 Oyster Point Boulevard, Suite 400, South San Francisco, California.  CytomX common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "CTMX."

15.    Defendant Sean A. McCarthy ("McCarthy") has served as CytomX's President and Chief Executive Officer at all relevant times.  McCarthy also served as CytomX's Principal Financial Officer between May 15, 2019, and March 23, 2020.

16.    Defendant Carlos Campoy ("Campoy") has served as CytomX's Chief Financial Officer ("CFO") since March 23, 2020.

17.    Defendant Debanjan Ray ("Ray") served as CytomX's CFO from before the start of the Class Period until May 15, 2019.

18.    Defendants McCarthy, Campoy, and Ray are sometimes referred to herein as the "Individual Defendants."

19.    The Individual Defendants possessed the power and authority to control the contents of CytomX's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of CytomX's SEC filings and press releases

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions

with CytomX, and their access to material information available to them but not to the public, the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

were being concealed from the public, and that the positive representations being made were then

materially false and misleading.  The Individual Defendants are liable for the false statements and

omissions pleaded herein.

20.     CytomX and the Individual Defendants are sometimes collectively, in whole or in

part, referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     CytomX was founded in 2008 and is headquartered in South San Francisco,

California.  CytomX operates as an oncology-focused biopharmaceutical company in the U.S.  The

Company develops a novel class of investigational antibody therapeutics based on its Probody

technology platform for the treatment of cancer.  CytomX's lead product candidates in the clinical

stage include, among others, CX-072, a Probody therapeutic targeting programmed cell death

ligand 1 immuno-oncology target; and CX-2009, a Probody drug conjugate (PDC) against CD166

novel drug target.

22.     CytomX has been evaluating CX-072 in its "PROCLAIM" series clinical program

for several years.  For example, the PROCLAIM-CX-072-001 clinical trial was designed to assess

the tolerability and preliminary antitumor activity of multiple doses of CX-072 as a monotherapy

or as a combination therapy with ipilimumab (which Bristol-Myers Squibb Company markets

under the brand name Yervoy) or vemurafenib (which Roche markets under the brand name

Zelboraf) in patients with advanced, unresectable solid tumors or lymphoma.  This study

5

proceeded in multiple parts—Parts A and A2, which are monotherapy dose escalation studies; Part B, which is a study of CX-072 in combination with ipilimumab; Part C, which is a study of CX-072 in combination with vemurafenib; and Part D, which is a monotherapy cohort expansion study to assess CX-072 in eight specific cancer types.  Additionally, as a result of data from Part B of the study, the Company also elected to conduct a Phase 2 clinical trial called PROCLAIM-CX-072-002, which was initiated in October 2019, and is an open-label, multi-center clinical trial evaluating CX-072 in combination with ipilimumab in patients with unresectable or metastatic melanoma.

23.     Likewise, CystomX had been evaluating CX-2009 under its own "PROCLAIM" brand clinical program.  This program includes the PROCLAIM-CX-2009-001 clinical trial, which is a Phase 1/2 trial evaluating the tolerability and preliminary antitumor activity of CX-2009 as a monotherapy, which CytomX initiated in June 2017.  This clinical program also proceeded in multiple parts—Parts A and A2, which are monotherapy dose escalation studies; and Part B, which is a Phase 2 expansion study of CX-2009 monotherapy at 7 mg/kg administered every three weeks in up to 40 patients with hormone receptor (ER, PR) positive, HER2 negative breast cancer, which Defendants announced in December 2019 based on the tolerability and activity data from Part A and A2 of the study.

**Materially False and Misleading Statements Issued During the Class Period**

24.     The Class Period begins on May 17, 2018.  On May 16, 2018, during after-market hours, CytomX issued a press release announcing that preliminary clinical results from the PROCLAIM-CX-072-001 trial would be presented at the 2018 Annual Meeting of the American Society of Clinical Oncology ("ASCO").  That press release quoted Defendant McCarthy, who touted that Defendants "look forward to expounding on our initial findings, published today in abstract form, at ASCO"; that "[t]he preliminary data in these abstracts are encouraging as

6

[Defendants] are observing initial signs of antitumor activity for both CX-072 monotherapy and the ipilimumab combination, in this difficult-to-treat, late-stage patient population for whom approved PD-agents are not available"; that "these data suggest that CX-072 is well tolerated and shows an encouraging, emerging safety profile as a monotherapy and in combination with ipilimumab"; and that "[t]aken together, [Defendants'] preliminary findings are consistent with the Probody hypothesis."

25.     The statements referenced in ¶ 24 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.     Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CytomX had downplayed issues with CX-072's efficacy observed in the PROCLAIM-CX-072 clinical program; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

26.     On June 4, 2018, during pre-market hours, CytomX issued a press release announcing preliminary clinical results from two arms of the PROCLAIM-CX-072-001 clinical trial, namely, CX-072 alone and CX-072 in combination with ipilimumab (the "June 2018 Press Release").  Preliminary results from these arms showed a 15% response rate and 55% disease control rate for CX-072 alone, and a 25% response rate and 33% disease control rate for CX-072 in combination with ipilimumab.

27.     Following the release of the foregoing data, CytomX's stock price fell $4.15 per share, or 16.26%, to close at $21.38 per share on June 4, 2018.  Despite this decrease in the Company's stock price, CytomX securities continued to trade at artificially inflated prices

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

throughout the rest of the Class Period because of Defendants' continued misstatements and omissions with respect to CX-072.

28.     For example, the June 2018 Press Release quoted Defendant McCarthy, who touted that "[t]hese first clinical results mark a major milestone for CytomX as we advance our Probody platform and introduce a fundamentally new approach to antibody therapeutic drug development"; that "[t]he findings presented today show that [Defendants'] lead wholly-owned program . . . CX-072, has the potential to become a new centerpiece of combination cancer therapy"; that "[t]hese preliminary results suggest that CX-072 as monotherapy and in combination with ipilimumab has a favorable safety profile and encouraging antitumor efficacy in late-stage, heavily pretreated cancer patients"; that, "[m]oreover, these clinical data check important boxes for the development of [Defendants'] core platform technology by showing that CX-072 remains stable in circulation over extended periods of dosing and elicits anti-tumor effects within the tumor microenvironment"; and that, "[b]ased on these initial results, [Defendants] have initiated multiple monotherapy expansion cohorts to further explore the safety and efficacy of this potentially differentiated PD-L1 inhibitor."

29.     The statements referenced in ¶ 28 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CytomX had downplayed issues with CX-072's efficacy observed in the PROCLAIM-CX-072 clinical program; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

30.     On October 22, 2018, during pre-market hours, CytomX issued a press release announcing further clinical results from the same two arms of the PROCLAIM-CX-072-001

8

clinical trial (the "October 2018 Press Release").  The results showed an 8% response rate and 47% disease control rate for CX-072 alone, and a 21% response rate and 43% disease control rate for CX-072 in combination with ipilimumab.

31.     On this news, CytomX's stock price fell $0.52 per share, or 3.38%, to close at $14.87 per share on October 22, 2018.  Again, despite this decrease in the Company's stock price, CytomX securities continued to trade at artificially inflated prices throughout the rest of the Class Period because of Defendants' continued misstatements and omissions with respect to CX-072, as well as additional misstatements and omissions related to CX-2009.

32.     For example, the October 2018 Press Release quoted Defendant McCarthy, who touted that Defendants' "data presented today continue to support our thesis that CX-072 has potential to be a new and differentiated combination partner for anti-cancer therapy"; that "CX-072 has demonstrated activity both as monotherapy and in combination with ipilimumab and is generally well tolerated in both regimens"; that Defendants "are advancing monotherapy CX-072 towards registrational studies and continuing to explore the full potential of the CX-072/ipilimumab combination"; and that, "[w]ith the clinical data reported today, and at ASCO, the Probody platform is declaring its potential to deliver multiple opportunities to make a meaningful difference for cancer patients."

33.     On February 26, 2019, CytomX issued a press release announcing clinical data highlights from its 2019 Research and Development Day (the "February 2019 Press Release"). With respect to the PROCLAIM-CX-072-001 trial's monotherapy arm, that press release highlighted that CX-072 "[c]ontinues to [d]emonstrate [f]avorable [s]afety and [d]urable [a]nti-[c]ancer [a]ctivity with [e]ncouraging [e]arly [s]napshot of [d]ata from [e]xpansion [c]ohorts in [s]elect [t]umor [t]ypes at 10 mg/kg." Specifically, in this regard, the February 2019 Press Release touted, in relevant part, that "the Company's PROCLAIM-CX-072 Monotherapy dose escalation

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(Parts A and A2) trial is complete without a maximum tolerated dose (MTD) having been reached"; that, "[o]f 24 efficacy evaluable patients with generally weakly [*sic*] immunogenic tumors and treated with doses greater than or equal to 3 mg/kg of CX-072, 12 (50%) demonstrated tumor shrinkage including four partial responses," which were comprised of "one confirmed partial response (ongoing), 2 unconfirmed partial responses who are off study and one unconfirmed partial response (ongoing with confirmation scan pending)"; that "CytomX selected 10 mg/kg as the dose for its expansion cohorts (Part D)"; and that "[t]his dose was chosen because it was estimated to achieve a greater than 98% receptor occupancy of PD-L1 expressed on the tumor, demonstrated a favorable safety profile, and demonstrated evidence of biological activity."

34.    The February 2019 Press Release also provided preliminary data from CytomX's PROCLAIM-CX-072 part devaluating CX-072 at 10 mg/kg in patients with triple negative breast cancer ("TNBC"), undifferentiated pleomorphic sarcoma ("UPS"), cutaneous squamous cell carcinoma ("cSCC"), and anal squamous cell carcinoma ("SCC") as of a February 6, 2019 data cutoff.  In this respect, the February 2019 Press Release touted, in relevant part, that, "[f]or the TNBC, UPS, SCC and cSCC cohorts, preliminary data from 34 efficacy evaluable patients, showed a preliminary pattern of anti-cancer activity generally consistent with historical data for other PD inhibitors."

35.    With respect to the PROCLAIM-CX-072-001 trial's arm evaluating CX-072 in combination with ipilimumab, the February 2019 Press Release highlighted that the "CX-072 anti-PD-L1 [p]robody [t]herapeutic in [c]ombination with YERVOY® (ipilimumab) [c]ontinues to [d]emonstrate [d]urable [a]nti-[c]ancer [a]ctivity and a [f]avorable [s]afety [p]rofile." Specifically, in this regard, the February 2019 Press Release touted, in relevant part, that "[t]he Company's PROCLAIM-CX-072 combination dose escalation of CX-072 with ipilimumab (Part B1) is complete with the MTD defined as the combination of 3 mg/kg of ipilimumab and 10 mg/kg of

10

CX-072"; that, "[o]f 19 patients evaluable for efficacy, four (21%) patients experienced confirmed responses as of the February 6, 2019 data cutoff"; and that "[t]hree of the four confirmed responses remained on drug as of the data cutoff, including one confirmed complete response (82 weeks) and 2 confirmed partial responses (59 and 64 weeks)."

36.     In addition to discussing results from the PROCLAIM-CX-072-001 trial, the February 2019 Press Release also discussed preliminary results from the PROCLAIM-CX-2009-001 trial. With respect to CX-2009's efficacy observed in that trial, the February 2019 Press Release touted, in relevant part, that "[t]he Company's PROCLAIM-CX-2009 dose escalation trial is complete"; that "[d]uring dose escalation, 76 patients were treated at doses ranging from 0.25 to 10 mg/kg of CX-2009 every 3 weeks"; that, "[a]s of the February 6, 2019 data cutoff date, preliminary data from 46 efficacy evaluable patients demonstrated evidence of anti-cancer activity observed at doses of greater than or equal to 4 mg/kg"; that "[t]umor shrinkage was observed in 16 (34.8%) patients in multiple tumor types with 5 unconfirmed partial responses (2 each in ovarian and breast cancers and one in head and neck cancer)"; and that, "[o]f note, comparable levels of anti-cancer activity was observed in patients who were PD-pathway inhibitor naive or resistant, respectively."

37.     With respect to CX-2009's safety observed in the PROCLAIM-CX-2009-001 trial, the February 2019 Press Release touted that "CX-2009 was generally well tolerated in the trial with 23 (30.3%) patients experiencing a Grade 3/4 TRAE [treatment related adverse event]," while also disclosing that "[t]he most common adverse event observed was ocular toxicity, an anticipated toxicity associated with the DM4 payload," and that "[o]ther Grade 3/4 TRAEs included liver function test abnormalities, gastrointestinal disorders and nervous system disorders." Despite these TRAEs, Defendants assured investors that, "[c]urrently, dose optimization is underway to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

further to inform dose selection," and that "[o]cular toxicity prophylaxis has been introduced to this dose optimization phase."

38.     The February 2019 Press Release also quoted Defendant McCarthy, who touted, in relevant part, that Defendants' "inaugural R&D Day will showcase the tremendous progress CytomX has made in building a pipeline of novel anti-cancer agents with our highly innovative Probody technology platform," and that "[t]he emerging clinical data from [Defendants'] two lead programs support the utility of [Defendants'] Probody technology in achieving th[eir] vision and sets [Defendants] on a path to building the long-term, integrated biotechnology company [they] have always envisaged."

39.     Finally, the February 2019 Press Release quoted CytomX's Chief Medical Officer, Rachel Humphrey, M.D., who touted, in relevant part, that "[t]hese preliminary data from [Defendants'] ongoing PROCLAIM program provide additional proof of concept for both CX-072 and CX-2009, as well as the Probody platform itself"; that "CX-072 continues to behave as designed with a safety profile as monotherapy and in combination that has the potential for meaningful differentiation from other PD-pathway inhibitors, while maintaining the expected efficacy for the class"; that, "[a]s additional data emerge from the ongoing clinical program, [Defendants] will be further defining the utility of this agent in the rapidly evolving oncology landscape"; and that Defendants' "CX-2009 data shows the ability of [their] technology to potentially address an entirely new class of highly expressed tumor antigens, with the opportunity to make otherwise undruggable targets available to patients with a wide variety of cancers."

40.     The next day, on February 27, 2019, CytomX filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K").  The 2018 10-K reaffirmed the results of the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

PROCLAIM-CX-072 and PROCLAIM-CX-2009 clinical programs as presented in the February 2019 Press Release.

41.     Appended as an exhibit to the 2018 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants McCarthy and Ray certified that the 2018 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act" and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company for the period covered by the [2018 10-K]."

42.     On February 27, 2020, CytomX filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  With respect to the PROCLAIM-CX-072 clinical program, the 2019 10-K touted the prior results Defendants disclosed regarding the PROCLAIM-CX-072-001 clinical trial, as well as additional data from Parts B and D of that trial.  Specifically, with respect to Part B of that trial, the 2019 10-K touted, in relevant part, that, "[i]n October 2019, [Defendants] presented interim data showing that among 27 evaluable patients who received ipilimumab (3, 6 or 10 mg/kg) combined with CX-072 (0.3, 1, 3 or 10 mg/kg), the disease control rate (stable disease or better) was 37%"; that "[f]ive patients achieved confirmed objective responses by RECIST v1.1, including one complete response, for an ORR [objective response rate] of 19% in these heavily pretreated patients"; that "[t]he median duration of response was 14.6 months (1.9 - 21.2 months) with four of the five responders still on treatment as of October 2019"; that Defendants "the recommended combination dose for further investigation was 3 mg/kg of ipilimumab and 10 mg/kg of CX-072 (dose equivalent of 800 mg)"; that "[e]nrollment in Part B is complete with evaluation of the activity and tolerability continuing with ongoing treatment"; that, "[a]s a result of the data in Part B, in October 2019, [Defendants] elected to conduct a Phase 2 clinical trial

studying CX-072 in combination with ipilimumab"; and that Defendants "plan to initiate a clinical study of CX-072 in combination with CX-2009 during 2020."

43.     With respect to Part D of the PROCLAIM-CX-072-001 trial, the 2019 10-K touted, in relevant part, that, "[a]t ASCO in June 2019, [Defendnats] presented additional data from Part D in multiple selected tumor types," with "[d]ata . . . reported in patients with TNBC, aSCC, cSCC, UPS and SBA"; that, "[a]s of an April 2019 data cutoff, 72 patients had been enrolled and treated across the five reported cohorts" and, "[a]mong the 65 patients evaluable for efficacy, confirmed partial responses were observed in two patients with TNBC, one in a patient with cSCC and one in a patient with UPS"; that "[a] partial response, unconfirmed at the time of data cutoff, was subsequently confirmed in an aSCC patient"; that "[t]hese data showed disease control rates of 53% (8/15) in TNBC, 58% (7/12) in aSCC, 67% (4/6) in cSCC, 25% (5/20) in UPS, and 17% (2/12) in SBA"; that "[d]ecreases in target lesion size were observed in the first 8 to 16 weeks of treatment"; and that "[e]nrollment in Part D is complete with evaluation of the activity and tolerability of CX-072 monotherapy continuing with ongoing treatment in select cohorts."

44.     With respect to the PROCLAIM-CX-2009 clinical program, the 2019 10-K touted the prior results Defendants disclosed regarding the PROCLAIM-CX-2009-001 trial, as well as additional data from April 2019.  Specifically, with respect to CX-2009's efficacy, the 2019 10-K touted, in relevant part, that, "[i]n April 2019, [Defendants] presented updated interim safety and antitumor data from the dose-escalation phase (Part A and A2) of the ongoing PROCLAIM-CX-2009-001 study at the annual meeting of the AACR [American Association for Cancer Research]"; that, "[a]s of a February 26, 2019 data cutoff, 78 patients were enrolled" with "[e]vidence of clinical activity . . . observed at doses of 4 mg/kg and above, a dose range at which DM4 conjugates have been shown by others to demonstrate anti-tumor activity"; that "39 patients received $\geq$4 mg/kg of CX-2009 and had at least one post-baseline on-study tumor assessment at time of data

cut-off"; that, "[o]f these, 15 (38%) patients had evidence of tumor shrinkage, including seven unconfirmed partial responses (four patients with breast cancer, two with ovarian cancer and one with head and neck cancer)"; and that "29 (74%) patients achieved stable disease or better at the time of the first on-treatment scan."

45.     With respect to CX-2009's safety, the 2019 10-K stated, in relevant part, that "[t]he most common TRAEs were grade 1 and 2 and included nausea (32%), fatigue (24%) and decreased appetite (23%)"; that, "[i]n the design of CX-2009, the CD-166 antibody is masked, but not the DM4 payload," and, "[t]herefore, non-specific, DM4-mediated toxicities, such as ocular toxicity, were expected and were seen in this trial"; that, "[a]ccordingly, the most common grade 3/4 TRAE was keratitis, occurring in 6 patients (8%), 5 of whom received doses equal to or greater than 8 mg/kg"; that "[t]he achievement of therapeutic doses of CX-2009 during this first dose escalation study of this agent in the absence of any evidence of acute, on-target, CD-166 toxicities, is consistent with the Probody platform hypothesis and with CX-2009 performing as it was designed"; and that "[e]nrollment in Q3W dose escalation is complete and [Defendants] have determined that 7 mg/kg is [their] Recommended Phase 2 Dose (RP2D)."

46.     Appended as an exhibit to the 2019 10-K were signed SOX certifications, wherein Defendant McCarthy certified, as both Principal Executive and Principal Financial Officer, that the 2019 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act" and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company for the period covered by the [2019 10-K]."

47.     The statements referenced in ¶¶ 32-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.     Specifically,

15

Defendants made false and/or misleading statements and/or failed to disclose that: (i) CytomX had downplayed issues with CX-072's efficacy observed in the PROCLAIM-CX-072 clinical program; (ii) CytomX had similarly downplayed issues with CX-2009's efficacy and safety observed in the PROCLAIM-CX-2009 clinical program; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Fully Emerges**

48.     On May 13, 2020, during after-market hours, CytomX made available abstracts for the Company's clinical presentations for CX-072 and CX-2009.  Results from the PROCLAIM-CX-072 clinical program showed a response rate of 8.8%, compared to a response rate of 18.5% in patients receiving the combination of CX-072 and ipilimumab.  Meanwhile, results from the PROCLAIM-CX-2009 clinical program showed "evidence" of clinical activity at doses at least 4 mg/kg 3x/week, but also suggested a significantly higher rate of serious or greater treatment-related toxicity to the eyes at dose equivalents at least 8 mg/kg 3x/week.  Specifically, the abstract for CX-072 disclosed, in relevant part, "[d]isease control rates (DCR = CR+PR+SD) were 41% for Mono10 (n = 47 of 114; 10 PRs) and 37% for Combo (n = 10 of 27; 1CR + 4 PRs (1CR and 3PRs at 3 mg/kg IPI [IPI3])."  The abstract for CX-2009 disclosed, in relevant part:

> Median number of CX-2009 doses was 2 (range, 1–15). For Q3W dosing, one dose limiting toxicity (DLT; grade 3 vomiting) was observed at 8 mpk; MTD was not reached up to 10 mpk. The RP2D for Q3W schedule was 7 mpk based on safety, dose-response, and population pharmacokinetic simulations. Q2W dosing continues; DLTs were observed at 6 mpk. Common treatment-related adverse events (TRAEs) at 7 mpk (n=9) were nausea (44%), fatigue, infusion-related reactions (both 33%), vomiting and arthralgias (both 22%). Grade 3 TRAEs occurred in 2 pts (nausea/vomiting; peripheral neuropathy). No pts discontinued at 7 mpk due to TRAEs. Ocular toxicity was dose dependent; mild to moderate reversible keratitis/blurred vision was seen in 3 pts at 7 mpk and mitigated by ocular prophylaxis. Partial responses were seen in 8 pts (2 confirmed, both HR+/HER2-BC) treated between 4–10 mpk, including BC (n=5), OC (n=2), and HNSCC (n=1). SD (≥1 on-study scan) was observed in 21 pts, 5 had SD ≥3 mos.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

49.     Following the release of the foregoing data, CytomX's stock price fell $5.21 per share, or 36.08%, to close at $9.23 per share on May 14, 2020.

50.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CytomX securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CytomX securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CytomX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CytomX;

- whether the Individual Defendants caused CytomX to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CytomX securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

57.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- the omissions and misrepresentations were material;

- CytomX securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold CytomX securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

58.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CytomX securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CytomX securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CytomX securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CytomX's finances and business prospects.

64.     By virtue of their positions at CytomX, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant

20

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of CytomX, the Individual Defendants had knowledge of the details of CytomX's internal affairs.

66.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CytomX.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CytomX's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CytomX securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning CytomX's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CytomX securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

67.    During the Class Period, CytomX securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CytomX securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CytomX securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of CytomX securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

70.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     During the Class Period, the Individual Defendants participated in the operation and management of CytomX, and conducted and participated, directly and indirectly, in the conduct of CytomX's business affairs.  Because of their senior positions, they knew the adverse non-public information about CytomX's misstatement of income and expenses and false financial statements.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

72.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CytomX's financial condition and results of operations, and to correct promptly any public statements issued by CytomX which had become materially false or misleading.

73.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CytomX disseminated in the marketplace during the Class Period concerning CytomX's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CytomX to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CytomX within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CytomX securities.

74.     Each of the Individual Defendants, therefore, acted as a controlling person of CytomX.  By reason of their senior management positions and/or being directors of CytomX, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CytomX to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of CytomX and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CytomX.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  May 21, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ & GROSSMAN,
LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _____Kevin Knight_____, make this declaration pursuant to

Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities

Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of

1995.

2.    I have reviewed a Complaint against CytomX Therapeutics, Inc. ("CytomX" or the

"Company") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire CytomX securities at the direction of plaintiffs' counsel or in

order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired CytomX securities during the class period, including providing testimony

at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate

lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in

CytomX securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have

not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the

class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs

and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed ___5- 18 - 20___
**(Date)**

_____
**(Signature)**

_____Kevin Knight_____
**(Type or Print Name)**

**CytomX Therapeutics, Inc. (CTMX)**                                                                **Knight, Kevin**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 5/7/2020 | Purchase | 95 | $12.4900 |
| 5/7/2020 | Purchase | 350 | $12.3355 |
| 5/7/2020 | Purchase | 225 | $12.4550 |
| 5/7/2020 | Purchase | 29 | $12.4750 |
| 5/7/2020 | Purchase | 261 | $12.4775 |